# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

RANDY LOYD GRAY,     )
         )
       Petitioner,  )
         )
vs.         )     **Case No. CIV-10-358-JHP-KEW**
         )
JIM FARRIS, Warden,     )
         )
       Respondent. )

## OPINION AND ORDER

Petitioner, Randy Loyd Gray, was convicted following a jury trial, in the District Court of Pittsburg County, Case No. CF-2006-242, of six felony charges, to-wit: 1) Oral Sodomy, in violation of OKLA. STAT. tit. 21, § 886; 2) Lewd or Indecent Proposals to a child under 16, in violation of OKLA. STAT. tit. 21, § 1123(A)(1); 3) Lewd Display of Pornography to a child under 16, in violation of OKLA. STAT. tit. 21, § 1021; 4) 1st Degree Rape by Instrumentation, in violation of OKLA. STAT. tit. 21, § 1114; 5) Lewd Display of Pornography to a child under 16, in violation of OKLA. STAT., tit. 21, § 1021; and 6) Lewd Molestation, in violation of OKLA. STAT., tit. 21, § 1123. On June 7, 2007, Petitioner was sentenced to twenty (20) years on Counts 1 and 6 and thirty (30) years on Count 4. Additionally, Petitioner was sentenced to five (5) years on Count 2, ten (10) years on Count 3, and fifteen (15) years on Count 5. Counts 1, 4 and 6 were ordered to run consecutive to each other. Counts 2, 3 and 5 were to ordered to run concurrent with Count 4. *See*, Dkt. # 9-3, at p. 31

or O.R. 431. On direct appeal, the Oklahoma Court of Criminal Appeals (hereinafter, "OCCA") summarily affirmed the Judgment and Sentence of the trial court. *Gray v. State*, No. F-2008-168, slip op. (Okla. Crim. App. July 1, 2009).[1] The petitioner did not file an Application for Post-Conviction Relief. Petitioner now seeks relief from his state court convictions, pursuant to 28 U.S.C. § 2254.

As a preliminary matter the Court notes that Jim Farris is currently the Warden at Lexington Assessment and Reception Center. The Court finds, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Jim Farris is the proper substituted Respondent and the Court Clerk shall be directed to note such substitution on the record.

## I. RECORDS REVIEWED

This Court has reviewed (1) the Petition for Writ of Habeas Corpus; (2) the Response to the Petition filed by the State of Oklahoma and attachments thereto; (3) Respondent's Supplemental Brief; (4) the state court records, including the transcripts from the preliminary hearing, motions hearing, pre-trial motion hearing, the jury trial, sentencing hearing, and hearing held on remand from the Oklahoma Court of Criminal Appeals. After a thorough review of the state court records transmitted to this court, the pleadings filed herein, and the law applicable to the facts of this case, the Court finds, for the reasons set out herein, Petitioner is not entitled to the relief requested.

---

[1]*See*, Respondent's Exh. # 5, Dkt. # 8-5.

## II.  STATEMENT OF THE FACTS

According to the testimony at trial, the victim's family[2] moved in with the Defendant's family in the summer of 2005.  The defendant, his wife and all three of their children slept in the master bedroom.  The victim's mother slept in one of the Gray children's bedroom and the victim and his brother slept in a third bedroom.  J.T.Tr. Vol. I, at pp. 101-103, 146, and 291.

During the time the victim was living with the Gray family,[3] the victim testified about several different sexual encounters with the defendant.  According to the victim, the first incident occurred in the defendant's daughter's bedroom and involved the defendant telling the victim to put lotion in his hands, to pull his pants down and rub the lotion on his penis.  During this incident, the defendant had lotion in his own hands and was touching his own penis.  Everyone else living in the home had gone to Wal-Mart and the victim was left alone with the defendant.  After about five minutes, they heard the screen door opening when everyone else returned home and both the victim and the defendant stopped and pulled up their pants.  Before the victim left the room, the defendant told the victim not to tell anybody or he would kick them out of the house.  *Id*., at pp. 105-110, 152-155, 158.

The second incident remembered by the victim occurred when the defendant called the victim to the defendant's bedroom, again when no one else was home.  When the victim

---

[2]The victim's family consisted of the victim, his mother and his younger brother.

[3]In May, 2007, when the case was tried, the victim was eleven years old and in the sixth grade.  J.T. Tr. Vol. 1, at pp. 99-100.

entered the bedroom, he saw the defendant had no pants on and there was a "nasty movie" on the TV (the men and women in the movie had no clothes on and the victim could see everything on their bodies).  The defendant was wearing a short-sleeved shirt.  The defendant called the victim over to the bed and told him to take his pants off and to get on the bed.  The victim complied, laying on his back.  The defendant was positioned on his stomach and the defendant began sucking on the victim's penis.  Again, the defendant told the victim if he told anyone, he would kick him out of the house.  *Id*., at pp. 112-116, and 156.  The victim further testified that Mr. Gray had an erection during the first incident; but, he could not remember if Mr. Gray had an erection the second time.  *Id*., at pp. 116-117.

On another occasion, while the other children were at home, the defendant called the victim into his bedroom and a "nasty movie" was playing.  During this incident, the defendant's wife and the victim's mother were not home.  *Id*., at pp. 117-119 and 157.  According to the victim' testimony, during the playing of this movie, one of the children knocked on the door "so [the defendant] pulled up his pants, took out the nasty movie, went into the bathroom, acted like he was using the bathroom."  *Id*., at p. 117.  The movie was played for five or ten minutes before the defendant removed it.  *Id*., at p. 118.

The victim also testified about going to the defendant's parent's house when the defendant's mother was in Texas and the defendant's father was out fishing with a buddy.  According to the victim, the purpose of the trip was to get some electrical tape.  However, after they got the electrical tape, the defendant pulled out a "nasty movie."  Before playing the movie, however, the defendant told the victim to pull his pants down and the victim

pulled both his pants and underwear down around his knees. After the movie began, the defendant also pulled his pants down. The victim said this movie involved two guys and a woman making a movie and they were all unclothed. After the movie was in, the defendant told the victim to sit down and then the defendant went to the victim and "forced [the victim] to touch his penis. *Id*., at pp. 123-129.

Moreover, the victim testified that the defendant put his finger in the victim's bottom on another occasion. Again, according to the victim, both the defendant's and the victim's pants were down when this occurred and the defendant again told the victim not to tell or he would "kick us out." *Id*., at pp. 128-131.

While the victim felt bad about what the defendant was doing to him, he never told the defendant to stop and he never told anyone about what was occurring because of his fear that the defendant would kick his family out of their house. *Id*., at pp. 131-132, 137, 158-159, 161 and 167.

Further, according to the victim, the "nasty movies" were kept in a closet in the master bedroom. *Id*., at pp. 133-134. The victim knew that they were in this closet because the defendant would go in there and come out with a movie. *Id*.

The victim finally confided in his Aunt Barb, Barbara Beavers, in February, 2006 while they were shopping in Wal-Mart. *Id*., at pp. 135-138. After hearing the victim's story, the Aunt contacted the Pittsburg County Sheriff's office and Deputy Thomas Steele interviewed the victim. The victim described two different movies that he had been shown by the defendant. The first one involved a woman wearing a strap-on penis and a man with

an erected penis and they were slapping them together. *Id.*, at pp. 181. The victim described a second video in which a black male with a ponytail, a white male and a woman in the scene were making a movie at the beginning of the video. *Id.*, at p. 182.

After obtaining this information from the victim, Deputy Steele obtained a search warrant and executed it at the defendant's home. *Id.* Two videotapes depicting the two images that the victim described were seized from the inside the master bedroom closet. The individuals in both videos were naked, and the videos depicted sexual penetration. *Id.*, at pp. 183-184.

To rebut this evidence, the defendant's mother, Gloria Gray, testified how the defendant suffers from congestive heart failure and diabetes. She indicated the defendant was very sick during the time that the family lived with them and that the defendant wasn't able to do very much; rather, he "just mostly rested." *Id.*, at pp. 204-205. During cross-examination, Ms. G. Gray admitted that her husband had friends that he goes fishing with and that she has friends or family that live in Texas. *Id.*, at pp. 207. Ms. G. Gray could not remember, however, if she went to Texas during the time the victim and his family was staying with her son. Moreover, Ms. G. Gray indicated that she had a sewing machine at her house but she denied that there was a television in the same room. Ms. G. Gray also stated that the victim had been to her house "once." *Id.*, at p. 209. Ms. G. Gray stated that, because of his health, the defendant was never left alone with the kids. *Id.*, at p. 211.

The defendant's ten year old daughter, Brandy, also testified about when the victim's family lived with them. She testified that her father was better healthwise when the family

lived with them "but he was still really sick." *Id.*, at p. 219. During this time, however, her father was able to walk around with a limp and he got nauseated and dizzy. *Id.* Brandy testified that her father never took care of the kids and he was never left alone with the victim. *Id.*, at pp. 220-221. During the time the victim's family was living with her family, Brandy said they only went to her grandmother's house "once." *Id.*, at p. 222.

The defendant's wife, Jennifer Gray, also testified. Ms. J. Gray testified that the defendant has never recovered from open heart surgery performed in 2002. J.T.Vol. II, at p. 245. She also testified that the defendant had diabetes, high blood pressure, and that he's had a staph infection since his open heart surgery. During June of 2005 and February 2006, the defendant was "gravely sick" and was not able to run errands and all driving was done by her. *Id.*, at p. 268-269. When the victim's family lived with them, the victim's mother was sick and was not able to take care of her own children. *Id.*, at pp. 247-248. As a result, Ms. J. Gray testified that anytime she went somewhere she took her children, the victim and his brother because the defendant wasn't even able to take care of his own children. *Id.*, at p. 250. Moreover, Ms. J. Gray testified there was no possible way for the allegations made by the victim to have occurred because the victim was always with her and he was never left alone with her husband. *Id.*, at pp. 250-251, 260. Furthermore, Ms. J. Gray testified the victim was mad because the Grays made them move and that the victim had been mad before because she had caught him in several lies. *Id.*, at p. 256. Ms. J. Gray also testified the box that the police took out of their closet belonged to the victim's parents, that the victim's mother brought it with her when she moved in, and the victim's mother told Ms. J. Gray

when she moved in to "[p]ut this in your closet." *Id.*, at p. 265. She further testified that the "porn movies" that were in the house belonged to the victim's mother and stepfather. *Id.*, at p. 268. Ms. J. Gray testified there was no way the defendant could have done what was alleged by the victim because he had no opportunity. *Id.*, at p. 266. Finally, Ms. J. Gray admitted that they had an AOL account that was "RAND1112;" but denied that her husband used that as his chat ID because they did not chat on the computer. *Id.*, at 277.

Thereafter, the defendant took the stand and testified when the victim's family lived with them he slept in his bed in the master bedroom and he would stay in bed a lot. He testified he might go through the house a little bit, but he couldn't do much of anything else. *Id.*, at p. 282. The defendant testified that his wife took him to his parent's house a lot to rest because there were just too many kids at his house. *Id.*, at p. 289. The defendant adamantly denied there was ever any occasion when he would have been left alone with the victim and he wasn't even left alone with his own children because he didn't want them to see him die. *Id.*, at p. 290. While describing the victim as a good kid, the defendant claimed the victim lied to him sometimes. *Id.*, at p. 291. Finally, the defendant corroborated his wife's testimony that some of the victim's mom's "stuff" was put in their closet and when the officer came looking for "stuff," he was specifically looking for the victim's mom's stuff. *Id.*, at pp. 293-294. The defendant claimed that Barbara was mad and "she used [the victim] to, I guess, fabricate the story." *Id.*, at pp. 295-296. The defendant denied having committed any of the offenses alleged stating that he didn't have the opportunity or the health. *Id.*, at p. 297. On cross-examination, the defendant denied that "Rand1112" was his chat ID,

because he doesn't chat. Rather, the defendant stated that was his e-mail address. *Id*., at pp. 301 and 308. Additionally, the defendant stated he was not familiar with the website Adult Friend Finder. *Id.*, at p. 301. Further, the defendant testified he basically had no sex life since his daughter was born (almost 4 years). *Id.*, at p. 308. Yet, when asked if he would be surprised if chat messages were on his computer, he indicated he wouldn't be surprised because a lot of people had access to his computer. *Id.* The defendant denied that, in January of 2006, he had attempted to set up a rendezvous with someone for sexual activity or that he ever attempted to set up a rendezvous wherein a female would be using a strap-on dildo on him during sexual intercourse. *Id.* The defendant then testified that the victim had access to his computer and he knew how to use the internet. *Id.*, at p. 314.

During rebuttal, the State introduced evidence that in February 2006, the defendant's daughter stated that her father and the victim had a close relationship and she felt left out. *Id.*, at p. 316. Additionally, the State introduced a statement made by Ms. J. Gray to Deputy Steele that contradicted what she had testified to in front of the jury regarding photographs. *Id*., at p. 317. Finally, the State introduced a forensic computer examiner who testified to having examined the defendant's computer and having found a chat session which occurred on January 8, 2006. The screen names of the participants were "Rand1112" and "Luvanurse." The person identified as "Rand1112 identified himself as "This is Randy,"

indicated that he lived in "Canadian, Okla."[4] and gave a physical description of the person.[5] Additionally, the computer examiner indicated that the chat involved "Rand1112 receiving anal sex from a female" in the conversation. *Id.*, at p. 334. The computer examiner also indicated that Luvanurse offered "to use a strap-on on Rand1112 and Rand1112 responded "yes." *Id.*, at p. 336. Finally, the computer examiner indicated a photograph was exported from the computer hard drive which depicted a nude female with a strap-on penis. *Id.*, at p. 338. On cross-examination, the computer examiner admitted he did not observe any chats involving child porn and he did not find any child pornography on the computer. *Id.*, at pp. 341-342. He also admitted he did not know who had downloaded the photograph onto the computer. *Id.*, at p. 342.

## III. STANDARD OF REVIEW

Petitioner filed his petition herein on September 29, 2010. As a result, this case is governed by the statute as amended by the Anti-Terrorism and Effective Death Penalty Act (AEDPA). See *Lindh v. Murphy,* 521 U.S. 320, 326-327, 117 S.Ct. 2059, 2063, 138 L.Ed.2d 481 (1997).

The AEDPA delineates the circumstances under which a federal court may grant habeas relief. Under the AEDPA's provisions, this Court is precluded from granting habeas relief on any claim adjudicated on the merits by a state court

---

[4]This was the name of the town where the defendant and his family lived during the alleged incidents.

[5]The physical description gave enough details that the jury could have decided if it was similar to the defendant's physical characteristics.

unless the adjudication of the claim—

     (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

     (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In *Williams v. Taylor*, 592 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the United States Supreme Court interpreted the above-quoted statute holding, in order for a petitioner to obtain federal habeas relief, the petitioner must first demonstrate that his case satisfies the conditions set by § 2254(d)(1). The starting point is to determine whether there was clearly established federal law at the time the conviction became final, as set forth in the holdings, as opposed to the dicta, of the Supreme Court. *Marshall v. Rodgers*, — U.S. —, 133 S.Ct. 1446, 1449, 185 L.Ed.2d 540 (2013) and *Carey v. Musladin*, 549 U.S. 70, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006). *See also, House v. Hatch*, 527 F.3d 1010, 1016-17 (10th Cir. 2008). If no clearly established federal law exists, this Court need not address whether the state court's decision was "contrary to" or involved an "unreasonable application" of such law. *Id.*, at 1018. Where, however, clearly established federal law exists, this Court must then consider whether the state court decision was "contrary to" or involved an "unreasonable application" of such law. *Id.*

A decision can be "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court case law or "if the state

confronts a set of facts that are materially indistinguishable from" a decision of the Supreme Court, but nonetheless arrives at a different result. *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (citing *Williams,* 529 U.S. at 405-406). When the state court applies the correct federal law to deny relief, the federal court can consider only whether the state court applied the federal law in an objectively reasonable manner. *See*, *Bell v. Cone*, 535 U.S. 685, 699, 122 S.Ct. 1843, 1852, 152 L.Ed.2d 914 (2002); *Hooper v. Mullin*, 314 F.3d 1162, 1169 (10th Cir. 2002).

On the other hand, the "unreasonable application" provision is implicated when "the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407, 120 S.Ct. 1520. "The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct.1933, 1939, 167 L.Ed.2d 836 (2007), *reh. denied*, 551 U.S. 1177, 128 S.Ct. 7, 168 L.Ed.2d 784 (2007). In *Renico v. Lett*, 559 U.S. 766, 130 S.Ct. 1855, 176 L.Ed.2d 678 (2010), the Supreme Court reiterated two principles. First, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law" and; second, the AEDPA "imposes a 'highly deferential standard for evaluating state-

court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'"
*Id.*, 130 S.Ct., at 1862 (citations omitted).

Moreover, the Supreme Court has made it clear that a state court is not required to cite Supreme Court caselaw, or even be aware of it, "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]." *Early*, 537 U.S. at 8, 123 S.Ct. at 365. Additionally, the Supreme Court has recently held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, — U.S. —, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011). Accordingly, "evidence introduced in federal court has no bearing on § 2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Id.*, at 1440 (footnote omitted).

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

In his petition filed herein on September 29, 2010, the petitioner claims he received ineffective assistance of counsel and was, therefore, deprived of a fundamentally fair trial and due process of law. Specifically, the petitioner claims 1) counsel had a conflict of interest; 2) counsel failed to investigate and present evidence; and 3) failure to prepare and present evidence Cross-examination of the victim.

Respondent argues that petitioner's claim that a conflict of interest prevented defense counsel from investigating the victim's background is not supported by the record. Further, the respondent contends that the OCCA's decision that trial counsel's conduct did not fall

below the wide range of reasonable professional conduct is neither contrary to nor an unreasonable application of federal law. Finally, the respondent asserts the petitioner has failed to overcome by clear and convincing evidence the OCCA's factual determination that the information contained in the discovery materials was "known to counsel."

## 1. Conflict of interest

Petitioner first claims that his attorney had a conflict of interest because prior to and after agreeing to represent the petitioner, his attorney represented the victim's mother in numerous criminal cases involving bogus checks and that he had discussed custody issues with the victim's mother. Petitioner argues that this conflict of interest prevented his attorney from investigating the case and properly building a defense. Additionally, petitioner claims counsel's conflict prevented counsel from negotiating the case effectively and from fully cross-examining witnesses in such a way that would reveal negative information about his other client.

Petitioner raised these claims in his direct appeal and the OCCA, citing *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984), denied the claims holding that "Appellant has not shown that counsel's conduct fell below the wide range of reasonable professional conduct." *Gray v. State*, No. F-2008-168, slip op. (Okla. Crim. App. Jul. 1, 2009).[6] Additionally, in denying petitioner's request for an evidentiary hearing to explore his conflict of interest claim, the OCCA stated, ". . . the record reveals that the evidence outlined in the motion and affidavits was known to counsel as the statements

---

[6]*See*, Respondent's Exhibit No. 5, Dkt. # 8-5, at p. 2.

were contained in his discovery material, thus it was not newly discovered. Counsel's failure to utilize this evidence did not fall below reasonable professional conduct." *Id*., at n. 1.

Although the state court's adjudication of the petitioner's ineffective assistance of counsel claim was limited, it nevertheless triggers deference under 28 U.S.C. § 2254(d)(1).

> A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision. *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Ibid*. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court. *Knowles v. Mirayance*, 556 U.S. —, —, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009)(internal quotation marks omitted).

*Harrington v. Richter*, — U.S. —, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011).

"Claims of ineffective assistance of counsel raise mixed questions of law and fact." *Miller v. Champion*, 262 F.3d 1066, 1071 (10th Cir. 2001). As a result, this Court proceeds under § 2254(1) to review the state court's determination. The threshold question in this case is the applicable legal standard. Habeas claims alleging denial of the Sixth Amendment right to effective assistance of counsel are normally analyzed under the familiar *Strickland* test. In order to state an ineffective assistance of counsel claim, a defendant must establish that the representation 1) was deficient because it fell below an objective standard of reasonableness under prevailing professional norms; and 2) the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. An exception to

*Strickland's* prejudice requirement exists, however, under *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

In *Sullivan*, the Supreme Court held "that the possibility of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Id*., at 350, 100 S.Ct. at 1719. *Sullivan* addressed separately a trial court's duty to inquire into the propriety of multiple representation, construing *Holloway v. Arkansas,* 435 U.S. 475, 482, 98 S.Ct. 1173, 1178, 55 L.Ed.2d 426 (1978)*,* to require inquiry only when "the trial court knows or reasonably should know that a particular conflict exists. . . . . ." *Id*., at 347, 100 S.Ct. at 1717. Thereafter, in *Mickens*, *supra*, the Supreme Court found that the presumed prejudice standard of *Sullivan* was clearly established only in the situation of a conflict of interest due to multiple concurrent representation. *Id*., at 175, 122 S.Ct. at 1245. The Court then discussed Rule 44(c) of the Fed.R.Cr.P. which treats concurrent representation of "jointly charged defendants" by a single attorney and successive representation by an attorney in a "substantially related matter." The Supreme Court explicitly left open the question of whether the *Sullivan* standard applied to a conflict of interest due to successive representation. *Id*., at 176, 122 S.Ct. at 1246. Additionally, the Supreme Court has never considered a scenario where the concurrent representation ends within approximately a week and/or is on substantially unrelated matters. See also, *Mosier v. Murphy*, 790 F2d 62, 65-66 (10th Cir. 1986) (prejudice is presumed **only** if the defendant

demonstrates that counsel was in fact deficient in that he '*actively* represented conflicting interests.').

This particular case does not involve the typical scenario of multiple concurrent representation of jointly charged defendants which has been addressed in previous Supreme Court decisions. Rather, Petitioner claims his attorney represented the victim's mother on unrelated criminal charges, *i.e.*, bogus check charges, obtaining food stamps by fraud and a forcible entry and detainer action.[7] Furthermore, in this case, the petitioner retained his own counsel and he was aware that counsel had previously represented the victim's mother in unrelated criminal cases and on custody issues involving the victim and his brother. *See*, Dkt. # 8-2, at p. 24. Yet, the petitioner never made the trial court aware of the potential conflict or raised any objections thereto. Furthermore, nothing within the record would have alerted the court to a potential conflict of interest. Therefore, this Court finds it was "'not an unreasonable application of clearly established Federal law" for the state court to apply *Strickland*.

---

[7]Two counts of Obtaining Merchandise by Bogus Checks was disposed of on June 30, 2006, approximately 7 days after counsel entered an appearance on the petitioner's behalf. *See*, Dkt. # 8-2, at p. 8. Another count of Obtaining Merchandise by Bogus Check was continued for disposition several times but other than a notation on the top of the docket sheet that Pat Layden was the attorney in the case, there is no indication that Mr. Layden made any appearances in the case after he began his representation of the petitioner. *See*, Dkt. # 8-2, at p. 13. Another count of Obtaining Merchandise by Bogus Check does not indicate that Mr. Layden was ever involved in this matter. *See*, Dkt. # 8-2, at p. 15. If, however, Mr. Layden was counsel of record, the case was disposed of by a plea of guilty on June 29, 2006, approximately 6 days after counsel entered an appearance on the petitioner's behalf. The docket sheet on a count of Obtaining Food Stamps by Fraud indicates the victim's mother was represented by Mike Miller, not Mr. Layden. *See*, Dkt. # 8-2, at p. 19. The final docket sheet for a forcible entry and detainer action does not indicate that Mr. Layden was ever involved in the case. *See*, Dkt. # 8-2, at pp. 21-22. In any event, the petitioner admits that all of these charges had been negotiated by the time of his trial. *See*, Dkt. # 2, at p. 21.

Moreover, in considering the allegations by Petitioner in light of the trial court record, it is clear that a conflict of interest,[8] if any, did not adversely or otherwise affect counsel's performance. While petitioner claims his counsel failed to investigate and pursue a viable defense strategy because he was conflicted, the trial court records establish counsel was aware of the information which the petitioner claims he did not investigate. Specifically, the petitioner alleges his attorney had a duty of loyalty to the victim's mom while at the same time trying to explain to the jury how this young child was "sexualized enough that he could make up these allegations." Dkt. # 2, at p. 21. Thus, the petitioner claims his attorney needed to show the jury what kind of family and background the child had in order to evaluate the child's credibility and that his attorney should have investigated and presented evidence that the victim had been exposed to sexually explicit conduct and material, by his mother and father, long before he came to live with the defendant and his family. Furthermore, the petitioner claims that the victim's mother and father were the ones who exposed the victim to pornography. The trial court record establishes that counsel was aware of these allegations and that he fought vigorously in an attempt to introduce such evidence at trial. Defense counsel filed a motion seeking production of records from the State of any investigations by the Department of Human Services regarding any juvenile deprived cases

---

[8]Petitioner cites Rule 1.9 of the Oklahoma Rules of Professional Conduct to show that a conflict of interest existed. That rule provides, in pertinent part, as follows:

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person *in the same or a substantially related matter* in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing. (Emphasis added).

This Court finds based on the trial court records that the representation of the victim's mother was not on the same or a substantially related matter as that of the petitioner.

established as a result of the investigation including records dealing with prior investigations by the Department of Human Services regarding the victim. In his motion, counsel alleged that it was his belief that there is evidence and records in the possession of the Department of Human Services which have not been provided to the defendant. Additionally, counsel's motion indicated that the victim had been the subject of previous Department of Human Services investigations and asked the court to compel the State to provide all records held by the Department of Human Services regarding the alleged victim. O.R. 144-145. The State objected to producing such information which they claimed was "neither material to guilt or punishment or relevant, as defined by title 12 O.S. § 2401." O.R. 154. Further, defendant's original and amended witness and exhibit lists establish that counsel had investigated the victim's past, including allegations that the victim may have viewed pornographic videos while his parents were asleep, may have seen pornography on his uncle's phone, and may have brought a Playboy magazine to school. O.R. 147-148 and 250-255. According to the witness summaries, many of the witnesses planned on testifying about the character of the Defendant and the "truth and veracity of the victim." *Id*. Thus, the trial court records reveal that defense counsel clearly investigated the victim's background for any sexual misconduct that might point the blame towards someone other than the petitioner.

Despite counsel's attempts to bring to the jury's attention the victim's past, the trial court granted two Motions in Limine by the State to prevent the petitioner from cross-examining the victim **or otherwise introducing any of the following**:

1.  Evidence of reputation or opinion regarding other sexual behavior of the victim or the sexual offense alleged;

2.  Evidence of specific instances of sexual behavior of the victim with persons other than the accused offered on the issue of whether the alleged victim consented to the sexual behavior with respect to the offense alleged;

3.  Specific instances of sexual behavior if offered for a purpose other than the issue of consent, . . . . . . ;

4.  False allegations of sexual offenses; or

5.  Similar sexual acts in the presence of the accused with persons other than the accused which occurs at the time of the event giving rise to the sexual offense alleged.

O.R. 139-140.  The Second Motion in Limine filed by the State, and granted by the trial court, prohibited the defendant, his lawyer and all of his witnesses from discussing in any manner any previous incidents involving the victim.  O.R. 155-156.  *See also*, Tr. of Pretrial Motion Hearing held on May 7, 2007.  At the same time, however, the court denied the State's requests to introduce evidence of other crimes.[9]  If defense counsel had persisted in his efforts to introduce the evidence that the petitioner now claims he was ineffective for failing to introduce, not only would he have violated the court's orders, it is highly likely the Court would have allowed the introduction by the State of their evidence of other crimes committed by the defendant, admission of which  would have been devastating to the defense

---

[9]The State had  filed a Notice and a Second/Supplemental Notice of Intent to Introduce Evidence of Other Crimes., O.R. 237-241 and 261-270, seeking to introduce evidence that, "as recently as 1985," the petitioner had engaged in multiple instances of sexual misconduct with his maternal nephew, a child who was then under 10 years of age.  The allegations against the petitioner included that he had made his maternal nephew perform oral sodomy on the child's cousin, who was under the age of 16 and that the petitioner had committed several more acts of sexual misconduct with his maternal nephew when his nephew was "junior high school-aged" (around 1987-1988).  In ruling on the material contained in the state's notices, the trial court found since the State's Motion in Limine had been granted preventing certain testimony coming out about the prior sexual behavior of the alleged victim, pursuant to Oklahoma's rape shield law, fundamental fairness demanded that these  old allegations about the defendant shouldn't be admitted either.  Tr. of Pretrial Motion Hearing held on May 7, 2007, at pp. 16-17.

testimony that the petitioner would never harm (or touch) a child the way the victim described.

The trial court record herein clearly establishes, as found by the OCCA, that counsel knew about the information which the petitioner asserts he was ineffective for failing to investigate and present at trial. Thus, the OCCA's decision was not based on an unreasonable determination of the facts in violation of 28 U.S.C. § 2254(d)(2). As a result, this Court finds the petitioner has failed to establish either prejudice under *Strickland* or **any** adverse affect upon his trial based upon Petitioner's perceived conflict of interest which he totally failed to object to and/or bring to the attention of the trial court as required by *Sullivan*. Finally, the petitioner's request for an evidentiary hearing is denied because, as previously stated, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, — U.S. —, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011).

## VI. CONCLUSION

For the reasons stated herein, Petitioner's Petition for Writ of Habeas Corpus (Doc No. 2) is hereby denied. Additionally, pursuant to Rule 11 of the Rules Governing Section 2254 cases, this Court hereby denies a certificate of appealability. The Clerk is hereby directed to enter a separate judgment in this matter.

**IT IS SO ORDERED** this  16th  day of September, 2013.

James H. Payne
United States District Judge
Eastern District of Oklahoma